**William SCHRADER, Petitioner–Appellant,**

v.

**John P. WHITLEY, Warden, and William J. Guste, Jr., Attorney General of State of Louisiana, Respondents–Appellees.**

No. 89–3648.

United States Court of Appeals, Fifth Circuit.

June 28, 1990.

---

2. It will not be necessary to file a new notice of appeal.

Virginia Laughlin Schueler, Asst. Federal Public Defender, John T. Mulvehill, Federal Public Defender, New Orleans, La., for petitioner-appellant.

John R. Walker, Asst. Dist. Atty., Houma, La., for respondents-appellees.

Before RUBIN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

William Schrader appeals the district court's denial of his petition for habeas corpus relief from the judgment of conviction entered against him in a Louisiana state court. Schrader was convicted in June 1986 by a jury which returned a responsive verdict of manslaughter, and the state trial court sentenced him to 21 years at hard labor, the maximum penalty for manslaughter. Schrader appealed, raising among other grounds that: (1) no rational jury could have found him guilty beyond a reasonable doubt; and (2) the trial court erred in denying his motion for a continuance based on the absence of a material witness. The Louisiana Court of Appeal for the First Circuit and the Louisiana Supreme Court each addressed both issues and affirmed.[1] The district court rejected his writ petition based on the same grounds in a careful and thorough opinion. We affirm.

As Schrader's sufficiency-of-the-evidence argument requires a comprehensive review of the trial, we summarize the facts briefly. Schrader was tried in 1986 for a death resulting from a fire at the home rented by Schrader and his family in Houma, Louisiana, on October 31, 1970. Catherine Marie Smith, a friend of Schrader's stepdaughter, died as the result of injuries sustained in the fire, the stepdaughter suffered perma-

---

**1.** *See State v. Schrader*, 506 So.2d 866 (La.App. 1987), *aff'd*, 518 So.2d 1024 (La.1988).

nent brain damage, and Schrader's wife, the only other occupant of the house at the time, was hospitalized but suffered no major injury. City and state officials investigated but reached no conclusion about the cause of the fire. Some fifteen years later, the state reviewed the original investigation and inspected the site of the fire, which had been preserved because of pending civil litigation, and then arrested Schrader. The state grand jury charged him with first degree murder, which the prosecutor amended without objection to a charge of murder to accord with the then-prevailing statutory scheme.

As the state court of appeals observed, the cause for the state's delay is "not definitively revealed,"[2] but Schrader does not present a speedy-trial claim. Instead, his claims focus on the evidence presented at trial and the trial court's refusal to allow him to improve his defense by allowing a continuance based on an absent witness.

## I.

■ Schrader's first argument asserts that there was insufficient evidence to support his conviction. Under the standard of *Jackson v. Virginia*,[3] habeas relief on such a claim is appropriate "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[4] Although Schrader suggests that we must also find that such a "reasonable"[5] jury would conclude that the evidence was inconsistent with every reasonable hypothesis of innocence, the authority cited concerns federal crimes;[6] in challenges to state convictions under 28 U.S.C. § 2254, only *Jackson* need be satisfied, even if state law would impose a more demanding standard of proof.[7] We attach "great weight"[8] to the fact that the Louisiana Supreme Court reviewed this claim under the appropriate standard.[9]

Because Schrader failed to make a timely objection to that part of the charge concerning the responsiveness of a verdict of manslaughter and makes no argument of prejudice now, we consider the *Jackson* question with regard to the elements of the charged offense, felony murder by aggravated arson.[10] As ultimately charged, the jury was responsible for determining whether Schrader had committed murder, that is, "the killing of a human being ... [w]hen the offender is engaged in the perpetration or attempted perpetration of aggravated arson, ... even though he has no intent to kill."[11] Aggravated arson in turn involved "setting fire to any structure ... whereby it is foreseeable that human life might be endangered," and required only general criminal intent.[12]

2. 506 So.2d at 870.

3. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

4. *Id.* at 324, 99 S.Ct. at 2791–92.

5. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 n. 2, 106 S.Ct. 2505, 2516 n. 2, 91 L.Ed.2d 202 (1986) (Brennan, J., dissenting) (querying difference between "reasonable" and "rational" jury standards).

6. *See United States v. Espinoza–Franco*, 668 F.2d 848, 849 (5th Cir.1982); *United States v. Hinds*, 662 F.2d 362, 366 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1720, 72 L.Ed.2d 140 (1982).

7. *See Jones v. Butler*, 864 F.2d 348, 361 (5th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989). *But cf. Knox v. Butler*, 884 F.2d 849, 856 n. 14 (5th Cir.1989) (dictum); *Swift v. Lynn*, 870 F.2d 1039, 1040 n. 2 (5th Cir.1989) (dictum); *Holloway v. McElroy*, 632 F.2d 605, 640 n. 55 (5th Cir.1980) (dictum), *cert. denied*, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981).

8. *Jackson*, 443 U.S. at 322 n. 15, 99 S.Ct. at 2790 n. 15.

9. *See Schrader*, 518 So.2d at 1036.

10. *See Bates v. Blackburn*, 805 F.2d 569, 574–75 (5th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *State v. Porretto*, 468 So.2d 1142, 1147 (La.1985); *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 251–52 (La.1982) (plurality opinion), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).

11. La.Rev.Stat.Ann. § 14:30(A)(2) (amended 1973).

12. La.Rev.Stat.Ann. § 14:51 (West 1986); *see State v. Simmons*, 443 So.2d 512, 521 (La.1983).

Schrader's argument that the evidence was insufficient to convict him of this crime may be parsed into two components: first, that the evidence did not sufficiently establish that the fire was not accidental, but rather was intentionally set; second, that the evidence did not sufficiently tie Schrader to the fire. With regard to both, he argues principally that the passage of time rendered the State's case infirm.

### A.

The State's two expert witnesses, Harold Myers and Jimmy Barnhill, did not examine the site of the fire until 1978 and 1985, respectively, but the owner of the property testified that he had boarded the house after the fire, and that the condition of the house was the same when Myers and Barnhill examined the site as it had been immediately after the fire. It is unclear whether a meter box and linoleum flooring had been removed, and whether, if they had been removed, this would have occurred before the defense witnesses inspected the house immediately after the fire, but Schrader does not attach particular significance to either potential source of information. In any event, Myers and Barnhill based much of their testimony on photographs taken during the official investigation itself, and on fixtures indisputably present during the fire.

Myers and Barnhill, who had conducted separate investigations at the behest of different parties, agreed that the evidence indicated a non-accidental fire, intentionally set and aided by the use of an accelerant such as gasoline. They testified that photographs of the exterior, the wooden flooring, doors, walls, and objects in the interior suggested burn, heat, and smoke patterns consistent with a rapid, intense fire originating at several locations in the house and likely spreading by virtue of a flammable liquid.

The defense presented the testimony of Howard Oubre, who as a city fire inspector had conducted an investigation of the premises with Robert Casse, then with the state fire marshall's office, immediately after the fire. Oubre and Casse had concluded that the cause of the fire could not be determined. Oubre testified that he had surveyed the house with an explosion meter, which did not indicate the presence of flammable gases or liquids, and that drafts might have produced the "hot spots" evident in the flooring. An affidavit from Casse was also introduced and stipulated to be subjectively truthful.[13] The affidavit stated that although the cause of the fire could not be determined, there was no sign that it was intentionally started, that the explosion meter had not indicated the use of any "inflammables," and that there was beading on the wire running to an air conditioner located in the living room consistent with an electrical short in the area of the wire. Casse's affidavit did not suggest that this short caused the fire.

Ulysses Guidry, whom the defense qualified as an expert electrician, testified that the "wiring in the house was inadequate for a typical residence now with all the household appliances," and that "if the large appliance and the air conditioning unit, or electric heat was put on that, it would be dangerous and would cause some, could possibly cause a fire." He admitted on cross-examination that under normal circumstances a fuse or circuit breaker would operate to prevent any damage, though he qualified this on redirect by observing that although a four-fuse box would have been sufficient for the house at one time, it would not have been sufficient for an abundance of appliances.

In their testimony, Myers and Barnhill explained that explosion meters were not reliable or dependable, and that a negative result could not exclude the use of an accelerant such as gasoline; when asked about the device's reliability on direct questioning, Oubre simply responded that "[w]ell, it's the best we had," and indicated that his unit had been properly maintained. The jury would be entitled to attach little weight to the explosion-meter results. Myers testified that the burn pattern was inconsistent with a fire originating at the

---

**13.** *See infra* section II.

air conditioner, that an electrical fire would not have produced multiple points of origin evident at the site, and that beading could have resulted from an accelerant-aided, intentionally-set fire. On cross-examination, Myers responded at length to the suggestion that the fire had begun with an electrical short at the air conditioner. Barnhill testified that he found no evidence that the fire was of electrical origin.

Although Myers and Barnhill could not establish that gasoline, as opposed to another accelerant, had been employed, a rational jury could have found beyond a reasonable doubt that the fire was intentionally set and that it had been aided by an accelerant such as gasoline. The testimony of Myers and Barnhill rebutted the evidence cited by the defendant's witnesses against such a scenario, and at best the rival hypothesis was that the fire's origin could not be determined. Schrader did not and has not established any reason for dismissing the State's experts' testimony on the basis of the passage of time, and their reliance on contemporary photographs and inspection of a virtually unchanged situs is sufficient to respond to any independent skepticism.

### B.

The State mustered three witnesses who circumstantially connected Schrader to the fire, a link Schrader's own testimony did little to dispel. Judy Smith Griffith, the victim's sister, testified that at a family gathering in her mother's home on Halloween night in 1970, when she was thirteen years old, she overheard Schrader tell his wife that "if she be there at the house when he gets there, that he's going to set it on fire." Griffith admitted on cross-examination that she had not told anyone (though perhaps meaning no one outside her immediate family) of Schrader's remark for fifteen years, in part because she was not interviewed with regard to the fire before that time.

Harold Foret also testified that on that Halloween he had heard Schrader tell his wife "that he was going to burn the house down," though he overheard the remark at the Schrader house that morning and in the wake of dispute between Schrader and Schrader's stepson. On cross-examination Foret was confronted with previous sworn testimony in which he alleged that Schrader had slapped his stepson on October 17th of that year; Foret responded that there must have been two separate altercations, that Schrader was always hitting his stepchildren, that his prior testimony may have been confused because he was unable to read or write, and that prior to his instant testimony he had not mentioned the Halloween incident because it "didn't come to my mind."

Finally, Teddy Lee Maherne testified that at around 7:30 or 8:00 pm on the night of the fire Schrader came to the gas station where Maherne worked and pumped some gas into a small can, claiming that he needed to fix his lawn mower. Maherne placed the date at around mid-October 1970, and claimed to have observed the smoke coming from Schrader's home later that evening, though the gas station was situated approximately a quarter-mile away. Maherne testified that he had known Schrader for about a year before the incident, that Schrader occasionally traded at the gas station, and that he was disliked by the proprietor and the owner. He also claimed to remember the general type of car that Schrader had driven to the gas station that evening.

Schrader denied going to the gas station that evening, recollecting that he already had gasoline in his car and would have had no reason to do so. He admitted on both direct and cross-examination that he might have made the statements attributed to him by Griffith while under the influence of drink, that he might have slapped his stepson that day, and that in any event he slept on the boat on which he worked that evening after he and his wife got into an argument over his stepson. (Although Schrader's deposition tended to suggest that he slept on the boat because of the argument, his testimony at trial stated that he was obligated to spend the night there.) According to Schrader, he repaired to the boat at around 6:00 that evening and did

not leave until the next morning. The remainder of Schrader's testimony was unremarkable, except insofar as it reflected on his credibility and criminality. Although he admitted on direct examination that he had been convicted "one time" approximately twenty years before of "[a]ggravated assault with intent to kill with a shotgun," he admitted on cross-examination to pleading guilty in 1983 to aggravated assault and admitted the possibility of a third conviction for aggravated assault.

Neither the State's nor the defense's witnesses impress us. The jury, however, has the sole responsibility to judge the credibility of witnesses,[14] and to reverse we would need to find that their testimony required a finding that would defy physical laws.[15] Viewing the evidence in the light most favorable to the prosecution,[16] we cannot conclude that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[17] The circumstantial case against Schrader can be summarized as follows: (1) the fire at his house was intentionally set by use of an accelerant, which may have been gasoline; (2) Schrader had twice threatened to burn down his house on that very day; (3) that evening, at a time when he claimed to have been ensconced on a boat, he had purchased a small amount of gas and placed it in a gasoline can. Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction,[18] and we conclude that the circumstantial evidence against Schrader was sufficient to satisfy the *Jackson* test.

## II.

Schrader also argues that the trial court erred in denying his motion for a continuance in order to obtain the live testimony of his expert Robert Casse, implicitly suggesting that this error abridged his rights to compulsory process and a fair trial under the Sixth and Fourteenth Amendments.

For reasons apparently unrelated to Casse's testimony, the trial court granted two continuances on defense motion, shifting the initial trial date from January 13, 1986, to June 2, 1986. During that period, defense counsel twice requested trial subpoenas for Casse and certain other witnesses, but on both occasions the subpoenas were returned unserved with notations indicating an improper address. The subpoenas do not indicate that defense counsel was ever appraised of the problem; indeed, the second subpoena contained the same mistaken address for Casse.

On June 2, after the court ordered that the trial commence the next day, defense counsel orally moved that the trial be continued for two weeks because "Casse was not served with his subpoena and he is a material witness for the defense." The State objected and the court denied the motion. The next morning defense counsel filed a written motion for continuance, including a detailed statement of the testimony Casse would be expected to give, and indicated that "[t]he defense may question Mr. Casse in rebuttal to testimony given by State witnesses depending on their testimony." After conference with counsel, the court stated:

> [The prosecutor] has agreed to stipulate that if Mr. Casse were present and testifying, that he would testify in accordance with those statements of fact set out in the motion for continuance. He's also agreed to stipulate that Mr. Casse, in addition to testifying to those facts, would testify—that his testimony would be truthful. Secondly, counsel have agreed that there exists a report submitted by Mr. Casse subsequent to his investigation, and that [defense counsel],

**14.** *See Knox,* 884 F.2d at 855; *Cobb v. Wainwright,* 666 F.2d 966, 971 (5th Cir. Unit B), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

**15.** *See Knox,* 884 F.2d at 855 n. 10 (citing *United States v. McKenzie,* 768 F.2d 602, 605 (5th Cir. 1985), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986)).

**16.** *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

**17.** *Id.* at 324, 99 S.Ct. at 2791–92.

**18.** *See, e.g., Jackson,* 443 U.S. at 319, 324–25, 99 S.Ct. at 2789, 2792; *Pate v. Wainwright,* 607 F.2d 669, 670 (5th Cir.1979) (per curiam).

in the course of his defense, shall be entitled to utilize that report, including putting it in evidence for the limited purpose of contradicting the testimony of any State's witness, in the event that that State's witness told something different to Mr. Casse, and Mr. Casse so stated in his report.

Defense counsel reserved his objection and had the court read the stipulation of Casse's testimony to the jury, but it does not appear that he had occasion to impeach any witness with the report from Casse.

■ The Fifth Circuit's test for determining whether an accused was deprived of his right to compulsory due process by a denial of a motion for continuance was set forth in *Hicks v. Wainwright:* "When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." [19]

■ As *Hicks* observed, " '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " [20] Among the factors to be considered with regard to the abuse-of-discretion component are:

[T]he diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is

able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.[21]

If abuse of discretion is demonstrated, the petitioner must sustain the burden common to due process claims that "there is a reasonable probability that the verdict might have been different had the trial been properly conducted"; [22] as applied to the alleged failing, that there is "a reasonable probability that the granting of a continuance would have permitted him to adduce evidence that would have altered the verdict." [23]

■ Considered without regard to the stipulated testimony, the abuse-of-discretion and prejudice inquiries would present extremely close questions. Defense counsel's projections as to his ability to secure Casse's live testimony within two weeks, the specifics of Casse's likely testimony, and its favorability were not contradicted at trial, and the trial judge did not suggest any exigencies weighing against a continuance.[24] At the same time, the defense counsel's diligence is in some doubt. The source of the incorrect address is unclear and was never successfully attributed to any state office; [25] moreover, there is no evidence that defense counsel attempted to contact Casse until three or four days before trial, at which point Casse explained that he would be out of state until the week of June 2.[26] Finally, Schrader has never explained how Casse's live testimony or capacity to rebut might differ from that afforded by the defense's two live expert

**19.** 633 F.2d 1146, 1148 (5th Cir. Unit B 1981) (citations omitted).

**20.** *Id.* at 1149 (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964) (denial of continuance for preparation of counsel)).

**21.** *Id.* at 1149 (quoting *United States v. Uptain,* 531 F.2d 1281, 1287 (5th Cir.1976) (internal citations omitted)).

**22.** *Kirkpatrick v. Blackburn,* 777 F.2d 272, 279 (5th Cir.1985) (per curiam), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

**23.** *Id.* at 281; *see also McFadden v. Cabana,* 851 F.2d 784, 788 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1541, 103 L.Ed.2d 845 (1989).

**24.** *See Kirkpatrick,* 777 F.2d at 278.

**25.** *See Fitzpatrick v. Procunier,* 750 F.2d 473, 477 (5th Cir.1985); *cf. Loggins v. Frey,* 786 F.2d 364, 367 (8th Cir.1986).

**26.** *See Volson v. Blackburn,* 794 F.2d 173, 176–77 (5th Cir.1986) (per curiam); *Uptain,* 531 F.2d at 1290–91.

witnesses, Oubre and Guidry. Oubre's testimony and testimonial capacity seem similar to Casse's, given that they investigated the site of the fire together, and Oubre was a superior witness with regard to the explosion meter test, which he had personally conducted. Although Casse's live testimony might have buttressed Schrader's defense, Schrader has not indicated how it would be more than cumulative.[27]

The stipulated testimony, moreover, cuts at once against any alleged abuse of discretion and against the likelihood that the testimony would have altered the verdict. Under Article 710 of the Louisiana Code of Criminal Procedure,

> When a motion for a continuance is based on the absence of a material witness, and the adverse party admits that if the witness were present he would testify as stated in the motion, the court may proceed to the trial of the case. If the court is of the opinion that despite the admission, the case cannot be tried with justice to the applicant, it may require the adverse party to admit also the truth of the testimony as a condition of refusing to grant the continuance.[28]

Louisiana courts have upheld the denial of motions for continuance even absent the additional truth stipulation, noting as appropriate the redundancy of the proposed testimony.[29] Similarly, in *State v. Hills*,[30] a motion for continuance, construed on appeal as a motion for recess, was denied when the absent police officer's testimony was read to the jury; the California Supreme Court upheld the denial, observing that the witness's likely testimony was approximated by the testimony of another officer who was present when the defendant was arrested.

The Fifth Circuit has not squarely confronted such a case in its own administration of the continuance rule. In *United States v. Fessel*,[31] a panel reversed the decision of the district court to deny a motion for continuance that would have afforded the defendant time to obtain new counsel. In assessing the consequences of the denial, the panel noted that the previous attorney's inadequacy had forced the defendant, who had conducted his own defense at trial, to rely on the written reports of government staff psychiatrists to establish his insanity defense. Under the circumstances, the defendant was forced to read to the jury state-generated written reports which obliquely addressed the issue of his competency at the time of the offense. The panel concluded that this substitute for live testimony adversely affected his defense, particularly since the defendant's articulate, self-serving presentation of testimony tended to undermine the basis for his insanity defense.[32]

Under the circumstances of this case, in which the trial judge extended both safeguards available under article 710, the live testimony would tend to be redundant with the testimony of another witness, the diligence of defense counsel is not apparent from the record, and the only articulated reason for the continuance was a preference for live testimony, we conclude that the trial judge neither abused his discretion nor affected the outcome of the trial in a manner that merits habeas relief.

For the foregoing reasons, the decision of the district court denying the petition for a writ of habeas corpus is

AFFIRMED.

**27.** *See Foots v. Louisiana,* 793 F.2d 610, 611 (5th Cir.1986) (per curiam); *contrast Dickerson v. Alabama,* 667 F.2d 1364, 1370 (5th Cir.), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

**28.** La.Code.Crim.Proc.Ann. art. 710 (West 1981).

**29.** *See, e.g., State v. Boyd,* 359 So.2d 931, 936 (La.1978).

**30.** 379 So.2d 740, 743 (La.1980).

**31.** 531 F.2d 1275 (5th Cir.1976).

**32.** *Id.* at 1280–81.