**Jimmy D. PEMBERTON,**
**Petitioner–Appellant,**

v.

**James COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.**

No. 91–1327.

United States Court of Appeals,
Fifth Circuit.

May 27, 1993.

Brett A. Ringle, Jones, Day, Reavis & Pogue, Dallas, TX (court-appointed), for petitioner-appellant.

R. Ray Buvia, Asst. Atty. Gen., Dan Morales, Atty. Gen., C. Rex Hall, Asst. Atty. Gen., Austin, TX, for respondent-appellee.

Before JONES and BARKSDALE, Circuit Judges and PRADO *, District Judge.

EDITH H. JONES, Circuit Judge:

Jimmy Dale Pemberton appeals the district court's denial of habeas corpus relief, claiming that his conviction for murder violated the federal Constitution. Pemberton is currently serving a life term in prison for the crime. Convinced that his conviction presents no constitutional error, we affirm. In so doing we reach a question of first impression: whether on habeas review of a state court conviction a federal court may consider a confession admitted at trial but subsequently held inadmissible under state law by a state appellate court. We hold that it may.

* District Judge of the Western District of Texas,

**I**

In the early morning hours of October 11, 1982, Helen Gay Pemberton was shot to death outside of her apartment in Dallas, Texas. Her young daughter, Tricia, remained asleep inside the apartment. Police quickly arrested her estranged husband, the petitioner, for the crime. After three days of interrogation, Pemberton signed the following confession:

On Friday, 10/8/82, my wife, Helen Gay Pemberton, called me and told me that she was taking Tricia and leaving. I love Tricia and want to see her so I went to talk to Gay. I went to talk to her Friday and sat, but Gay was not at home. Sunday, I was at home and had gone to bed with Linda Thornbrough [sic], about 10:20 PM. I woke up sometime between 2:30 and 3:30 AM with a bad dream. I saw Gay going over a cliff in the van. I layed there for awhile and went back to sleep with Linda holding me. Later, I woke up about 3:30 AM or 4:00 AM and drove to Gay's apartment in Linda's husband's pickup truck. When I got to Gay's, I knocked on her door until she answered. Gay let me in and we talked about her leaving with Tricia. I wanted her to leave Tricia with me and she could do what she wanted. Gay said she had met a guy from Stillwell, Oklahoma and she was leaving town. Gay had gone to the bathroom and changed clothes during the time we had been talking. She had on a white blouse and blue slacks. Gay started an argument about her leaving with Tricia. During the argument, Gay pulled a gun that I think she got from her purse. I told her to shoot me. I was on the couch and I got up and went across the coffee table and got the gun away from her. After I got the gun, Gay turned to run out the door and she fell out the doorway. Gay got up and I shot her and she fell and I just kept shooting her three or four times. I may have shot her all six times, I don't know. I ran out the door and got into the truck and left. I was on Brown Drive going toward Pioneer, after I passed the stop

sitting by designation.

sign I threw the gun out. I then went back home and went back to bed.

Near Helen Gay's body, police found a check payable to Pemberton in the amount of $47.87, the exact amount Helen Gay had in her bank account. They also found a note written to "Jimmy" that apologized "for all I have done to you." The police never found the murder weapon. No fingerprints were found on or near the body. No one witnessed the shooting. There was no physical evidence linking Pemberton to the crime.

Pemberton requested and obtained a state court bench trial. At trial, he claimed that the confession he signed was coerced through numerous acts of physical and psychological abuse. Pemberton testified that when no other officers were present, Officer Cheek, one of the interrogators, graphically described his wife's fatal wounds. He also testified that when he and Cheek were alone, Cheek showed him gruesome pictures of corpses. He said further that Cheek, apparently in the presence of other officers, banged his (Pemberton's) head against a utility table and a metal file cabinet. Pemberton, who is white, said that Cheek told him that Helen Gay had sexual relations with blacks and Mexicans. Pemberton also claimed that Cheek threatened to prosecute him for unsolved grocery store robberies in the area.

The state did not call Officer Cheek to rebut Pemberton's allegations. However, the state did call the other interrogators, who denied that any physical or psychological abuse had taken place. One of them, Officer Dix, testified that of the five times the interrogators interviewed Pemberton, only one session involved Cheek. Dix said that he himself was present during that interview and that no coercion took place. Pemberton confessed to Officer Jobe in the presence of a witness, Rachel Moon. The trial judge admitted the confession into evidence.

Apart from the confession, the state presented circumstantial evidence that Pemberton had committed the crime. On August 31, 1982, Officer Robert Belmont had been called to Mrs. Pemberton's apartment to intervene in a disturbance between her and Pemberton. After being told that a restraining order had been issued against Pemberton, Belmont ordered Pemberton to leave. Upon leaving, Pemberton turned to his wife and said, "You divorced me, bitch, and I will kill you and put the kid in an orphanage."

About a week before the murder Pemberton asked Linda Thornberry, with whom he was then living, to get him an unregistered gun. He told her he wanted the gun so he could force Helen Gay to leave Texas so she couldn't testify in a criminal trespass case that she had filed against him. He was also angry because he believed she was pregnant with another man's baby. He said he would force Helen Gay to write a note admitting that she had been impregnated by a black man. Pemberton also asked Roy Thornberry, Linda's husband, to loan him a gun.

On the Friday night before the murder, Linda Thornberry came home to find Pemberton leaving the apartment with a full change of clothes, a tire iron, and a butcher knife. He took these things to a truck, and then came back inside the house, saying, "You'd better try to stop me because I was on my way to kill Gay." Linda responded that she would call the police and that Pemberton would have to kill her too. Pemberton replied, "What would be one more life?"

On the Saturday before the murder, Pemberton borrowed Roy Thornberry's truck. Roy testified that Pemberton was very upset with Helen Gay at this point. Immediately after the shooting, Officer Belmont, remembering Pemberton's threat of a month before, went to Pemberton's apartment. There, he found Roy's truck, its engine still warm and "snapping and cracking."

Belmont and Officer Ferris kept watch on Pemberton's apartment for fifteen minutes until Pemberton exited at 5:00 a.m., whereupon Belmont and Ferris arrested him. The officers surmised that Pemberton had just bathed, because his hair was wet and he smelled of soap. The state theorized that Pemberton had washed in

order to remove any gun powder residue from his skin. Indeed, a hand washing at the police station shortly after the arrest turned up no residue.

After Pemberton's arrest, Linda and her neighbor, Shirley Pollard, found a note from Pemberton saying he had gone out and would be back soon. Because they were frightened, they destroyed the note. Later, Pemberton threatened to accuse Pollard of arson unless she testified that Linda had murdered Helen Gay.

Finally, over Pemberton's objection, the trial judge allowed the state to introduce "double" hearsay evidence from a police officer who said that other unnamed police officers told him that unnamed witnesses told them that they saw a brown truck with yellow stripes leaving Helen Gay's apartment complex shortly after the murder. The description matches the description of Roy's truck, which Pemberton had borrowed the night before the murder.

The trial judge found Pemberton guilty of murder, sentencing him to life imprisonment and imposing a fine of $10,000. The state appellate court, in an unpublished opinion, affirmed. In the course of its opinion, the state appellate court held that the confession was inadmissible as a matter of state law because the state failed to present Officer Cheek to rebut Pemberton's testimony that the confession was coerced. Nevertheless, the appeals court affirmed the conviction on the strength of the remaining evidence. The Texas Court of Criminal Appeals denied discretionary review. In October 1989, the Texas Court of Criminal Appeals denied his application for state habeas review and, later, habeas relief.

Pemberton then filed this petition for federal writ of habeas corpus. The magistrate judge concluded that the evidence at trial, including the confession, was constitutionally sufficient to convict Pemberton. The magistrate judge held that she was entitled to consider the confession because the state appellate court's ruling that it was inadmissible under state law was of no moment on federal habeas review. Pemberton lodged his objection, but the district

court adopted the findings and recommendation of the magistrate. This appeal followed.

## II

Pemberton's underlying claim is that the evidence was constitutionally insufficient to convict him. To reach that conclusion, Pemberton urges that neither the confession nor the hearsay evidence should be considered as supporting his conviction. His argument is that minus the confession and hearsay testimony, the state's case rested entirely on insufficient circumstantial evidence. We need not decide whether the state's circumstantial evidence alone would be sufficient to convict Pemberton because we hold that the confession was properly considered as evidence of Pemberton's guilt. We turn first to this issue.

Pemberton argued, and the Texas Court of Appeals agreed, that under settled Texas law, Officer Cheek's failure to testify rendered Pemberton's confession inadmissible. See, for example, *Farr v. State*, 519 S.W.2d 876, 880 (Tex.Crim.App.1975) (uncontroverted allegations of coercion render confession inadmissible). Once the Texas Court of Appeals found that the confession was inadmissible, Pemberton adds, the confession somehow ceased to exist and became irrelevant to any determination of the constitutionality of his trial. He contends that a federal court in habeas has no authority to "readmit" evidence excluded by the state court. The State, citing *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), counters that federal courts are not bound by state court determinations on voluntariness and that the issue is a matter for independent federal determination. Pemberton rejoins that *Miller* is irrelevant, claiming that the issue is not the voluntariness of the confession but the power of state courts to police their own evidentiary rules and the duty of federal courts to defer to state court decisions about those rules. In the alternative, he argues that *Miller* is effectively a one-edged sword: it permits federal courts to review a state court finding that a confes-

sion is *voluntary*, but not that it is *involuntary*.

In tackling this issue for the first time, one must recall the properly limited role of a federal court when a habeas petitioner challenges a state court conviction. A federal habeas court grants relief when the petitioner is held "in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution* or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). A federal habeas court asks only whether a constitutional violation infected the trial. *See also, Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 859, 122 L.Ed.2d 203 (1993).

Stated that way, our mission guides our answer. We may consider the confession here provided its admission into evidence did not create a constitutional problem, even though the state appellate court held the confession inadmissible under state law. An error in the application of state law by the trial court does not provide grounds for habeas relief. *Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982) ("Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief."); *Hill v. Black,* 887 F.2d 513, 522 (5th Cir.1989) (state rule of evidence on co-inmate's statement not an issue for habeas court). *See also Peters v. Whitley,* 942 F.2d 937 (5th Cir.1991). These cases involved claims by a petitioner that a state court ruling was erroneous under state law, while Pemberton argues that the state appellate court ruling was correct and does not ask us to review it. Indeed, he entreats us not to consider the confession at all. Nevertheless, the logic of these cases suggests that a federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on our review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution. Thus, the fact that the

confession was inadmissible—but not involuntary—under Texas case precedent does not give Pemberton ground upon which to stand in a federal habeas proceeding.

*Miller,* 474 U.S. 104, 106 S.Ct. 445, aids this analysis but does not end it. In *Miller,* the Supreme Court held that a state court's finding that a confession is voluntary is not entitled to the presumption of correctness mandated by 28 U.S.C. § 2254(d) for state court findings of fact. *Id.* at 111, 106 S.Ct. at 450. It held that "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Id.* at 111–14, 106 S.Ct. at 450–51. The lower state court in *Miller* had determined that the confession there was voluntary. Pemberton argues that *Miller* is centrally concerned with a state's attempt to secure a conviction through a defendant's own admissions. He argues that since his confession was thrown out by the state appellate court, that concern does not arise here. However, *Miller*'s language is broader than Pemberton's reading of it, commanding independent federal review anytime a confession is involved in securing a conviction. A state court's conclusions do not limit this review. *Miller* focuses on the compatibility of the confession with the Constitution, not with state court procedure or state law.

We cannot indulge the petitioner's cherished fiction that his confession "ceased to exist" for federal habeas review purposes because the state appellate court ruled it inadmissible. If, for example, a state appellate court ruled a confession inadmissible under state law but nevertheless upheld the conviction based on other evidence, the federal court would be required to consider whether the confession was coerced and, if so, whether admission of that confession amounted to harmless error in the context of the trial. *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We would be authorized to determine that it was coerced and that its introduction at trial was not harmless error,

notwithstanding the state's contrary rulings. Neither law nor logic suggests a different approach here, where, as we discuss below in Section III, we hold the confession was not coerced.

Another analogy arises from Supreme Court constitutional case law. When reviewing the sufficiency of the evidence in a habeas case for double jeopardy purposes, a federal court considers all of the evidence adduced at trial, even though some of the evidence was later held inadmissible under state law. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). *Lockhart* distinguished between insufficiency that shows "the government has failed to prove its case" and those trial errors that imply nothing with respect to the guilt or innocence of the defendant but do manifest a defect in the judicial process against him. 488 U.S. at 39–40, 109 S.Ct. at 290. Pemberton does not seek to bar a retrial on grounds of double jeopardy, yet his argument, by requiring constitutional relief for a non-constitutional violation of state law, would fail the distinction articulated in *Lockhart.* *See also Gilley v. Collins*, 968 F.2d 465, 467 & n. 1 (5th Cir.1992) (federal court considers evidence presented at trial and contained in the record on appeal); *Young v. Guste*, 849 F.2d 970, 972 (5th Cir.1988).[1]

State appellate courts are free to police their own evidentiary rules. The Texas Court of Appeals did so in this case, ruling the confession inadmissible. Nothing here questions the state appellate court's interpretation of Texas evidentiary law, *Fierro v. Lynaugh*, 879 F.2d 1276, 1278 (5th Cir.1989), or undermines Texas' ability to enforce its rules as it sees fit. Deference to state court decisionmaking about procedural rules simply does not counsel that we refuse to consider the confession. Moreover, federal habeas courts do not always defer to state rules. For example, when reviewing the sufficiency of evidence to support a conviction a federal habeas court applies the federal standard

adopted in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), even if the state would require a higher standard of proof, *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir.1990), because it is the *Constitution* we are enforcing.

In short, this court accepts that the confession was not properly admissible under state law, but that does not prevent its consideration. And it does not begin to answer the question whether admitting the confession violated the federal constitution, justifying the extraordinary step of ordering retrial or release of the prisoner. That question will now be addressed.

## III

### A

The petitioner contends that his confession was involuntary and therefore constitutionally inadmissible. At trial, he alleged that Officer Cheek abused him psychologically when no other officers were present. He also alleged that the officers abused him physically. Two interrogating officers, Dix and Jobe, denied unequivocally that any physical or psychological abuse took place. Dix testified that the officers conducted "about" five interviews with Pemberton. Three of the interviews were conducted by Dix, with Cheek present during one of the interviews. Dix shared an office with Cheek, making Dix a particularly keen and credible observer of the allegedly offending officer. Jobe conducted one interview by himself. Investigator Ratcliff conducted the fifth by himself. Although Cheek himself did not testify, and Dix did not specifically state that Cheek never interviewed Pemberton alone (neither the defense nor the prosecution asked Dix that question), Dix's account plausibly rebuts Pemberton's claim that Cheek interrogated him when no other officers were present. *See United States v. Rodgers*, 755 F.2d 533, 546 (7th Cir.1985) (although officer did not specifically deny defendant's allega-

---

1. The confession in this case unquestionably was adduced at trial and it provided a basis for

the conviction in the trial court.

tions, his and other officer's testimony taken as a whole controverted the allegations).

█ Uncontroverted evidence of coercion might well raise a serious question about the voluntariness of the confession, *see Haynes v. Washington,* 373 U.S. 503, 510, 83 S.Ct. 1336, 1341, 10 L.Ed.2d 513 (1963), although federal law knows no such hard-and-fast rule as the one applied under Texas law by the state appellate court. *Haynes* is concerned with the motivation of the state in failing to controvert testimony of coercion: if the interrogators could truthfully deny allegations of coercion, the state would call them to do so. *Id.* at 510, 83 S.Ct. at 1341. Under some circumstances, their absence strongly implies that abuse occurred. But the absence of testimony from Cheek, so conspicuous and ominous to the petitioner in his appellate brief, does not trouble us. The other officers did testify, one of them indicating that Cheek played a minor role in the interrogation of Pemberton. On cross-examination, no questions were asked about Cheek's role. After these officers testified, Pemberton himself took the stand to describe his custodial experiences. In two brief references, Pemberton mentioned that Cheek gave him the third degree when the two men were alone, showing Pemberton gruesome pictures and making an off-color remark about the murder. The state had little reason at trial to believe that Cheek was the minotaur Pemberton now claims he was. Moreover, the trial judge, having heard enough, cut off further testimony on the voluntariness of the confession immediately following Pemberton's testimony; the state had no opportunity to call Cheek. Yet only after listening to Pemberton's testimony could the state have been put on notice that he was alleging abuse at Cheek's hands. *Compare Haynes,* 373 U.S. at 510, 83 S.Ct. at 1341 (faulting failure of the state, "after listening to the petitioner's direct and explicit testimony," to call officers). Thus, we do not have reason to ascribe sinister strategic motivations to the state's failure to call an officer present at the interrogation, as the Supreme Court did in *Haynes.*

█ Moreover, the officers' overall account fairly conflicted with Pemberton's, even if some particulars went unchallenged, taking this case out of the ambit of *Haynes.* The trial judge was essentially presented a swearing match between Pemberton and the officers as to whether any coercion occurred and as to the identity of the officers present at the various interviews. The habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact. *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982). The trial judge must have believed the version of the story told by the state's witnesses, as evidenced by his finding that the confession was voluntary. *Andersen v. Thieret,* 903 F.2d 526, 529–30 (7th Cir.1990) (trial court's conclusion that confession was voluntary is fairly interpreted as a rejection of defendant's allegations of abuse). The trial judge, in a written order, made no finding supporting Pemberton's account of the interrogation.

Finally, the state appellate court did not disturb the trial judge's factual finding. It held that the state had not met its burden of proof as to voluntariness under state law. State evidentiary law apparently required Cheek himself to come forward and deny Pemberton's specific allegations. The state law determination of inadmissibility did not determine voluntariness and in any event, as stated, is not binding on this court.

█ The habeas corpus statute provides that a state court's factual determination must be presumed correct "unless ... the federal court concludes that such factual determination is not supported by the record." 28 U.S.C. § 2254(d). Whether the police engaged in the coercive tactics alleged by the defendant is a subsidiary fact; as such, the trial court's finding is entitled to deference on habeas review if it is supported in the record. *Miller,* 474 U.S. at 112, 106 S.Ct. at 450. The testimony of the state's witnesses provides support for the state trial court's finding that no abuse occurred. This court cannot credit Pemberton's allegations.

**B**

The next question is whether, under the totality of the circumstances, the confession was voluntary. 474 U.S. at 112, 106 S.Ct. at 450. Accepting the trial court's subsidiary fact finding that the alleged coercive incidents did not occur, it follows that Pemberton voluntarily confessed to killing Helen Gay.

However, even if Pemberton's testimony concerning Officer Cheek were uncontroverted, his testimony establishes only that when no other officers were present Cheek showed him gruesome pictures and made an off-color remark about Helen Gay's murder. A careful reading of Pemberton's testimony reveals that the other claimed incidents of physical and psychological coercion took place in the presence of other officers. Dix and Jobe at the very least controverted these latter allegations and, as we have said, the trial court was entitled to believe the officers. Given that Pemberton did not render his confession to Cheek, was advised repeatedly of his right to remain silent, was never subjected to promises or threats, and was never abused physically, we cannot say that a single off-color remark and exposure to gruesome pictures made his confession not "the product of a rational intellect and a free will." *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). Admitting the confession into evidence did not violate the Constitution and it may be considered in federal habeas corpus review of Pemberton's trial.

**IV**

We next consider the hearsay testimony. A state court's evidentiary ruling presents a cognizable habeas claim only if it runs afoul of a specific constitutional right or renders the trial fundamentally unfair. *Johnson v. Blackburn,* 778 F.2d 1044, 1050 (5th Cir.1985). The petitioner argues that the admission of the hearsay in this case—that unnamed officers said that unnamed witnesses said they saw a brown truck leaving the scene of the crime—both violated the Confrontation Clause and rendered his trial fundamentally unfair.

The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." It has been held that the admission of hearsay may violate the Confrontation Clause unless the state shows that the statement was admitted under a firmly rooted exception to the hearsay rule or otherwise bears sufficient indicia of reliability. *White v. Illinois,* —— U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Idaho v. Wright,* 497 U.S. 805, 816, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990). The state did not address in its brief the existence of a Confrontation Clause error, but even assuming *arguendo* that the hearsay description was unconstitutional, federal habeas corpus relief will not be granted unless the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993), quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946).

The error in this case was not so egregious. The hearsay evidence that some witnesses saw a brown truck with yellow stripes leaving the murder scene does not have near the force of a confession, *Arizona v. Fulminante,* —— U.S. ——, ——, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991), or of repeated references to a defendant's failure to testify, *Chapman v. California,* 386 U.S. 18, 25–26, 87 S.Ct. 824, 828–29, 17 L.Ed.2d 705 (1967). The hearsay description in this case was a bare-bones one, describing only a brown truck with yellow stripes. The truck parked outside Linda Thornberry's apartment did not belong to Pemberton, although there was evidence that he had borrowed it the night before the murder. Further, the description could match a number of trucks in a part of the country where pickups are common. The testimony simply did not have much probative force in the context of the trial. We are especially confident of this conclusion in light of

the fact that the case was tried before a judge, not a jury. Given the evidence presented at trial tying Pemberton to the murder, especially the confession, we are persuaded that the hearsay evidence did not "substantially influence" the verdict.

■ For similar reasons, admission of the hearsay did not render the trial fundamentally unfair. A state court's evidentiary ruling violates the Due Process Clause if it renders the trial fundamentally unfair, which is to say only if it relates to evidence that is crucial, critical, and highly significant. *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir.1987). In the face of a confession, the most probative and damaging evidence that can be admitted against a defendant, *Fulminante*, —— U.S. at ——, 111 S.Ct. at 1257, Pemberton's threats to the life of the victim, and other circumstantial evidence, the hearsay testimony elicited at trial was not crucial.

## V

Finally, we examine whether the evidence was sufficient to convict Pemberton consistent with due process. Pemberton argues that, absent the confession and hearsay, the evidence was insufficient to convict him. Under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), the critical inquiry on review of sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis original). We do not apply a higher standard, as the petitioner advocates, even if state law would impose one. *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir.1990). At any rate, Pemberton does not challenge the sufficiency of the evidence when the confession is included in the quantum that convicted him. Suffice it to say that Pemberton's confession to the murder of his wife, not to mention his contemporaneous threats against her life and the other circumstantial evidence presented, leave no doubt that a rational trier

of fact could convict him of taking this young mother's life.

## VI

For the foregoing reasons, the decision of the district court is **AFFIRMED.**