**Ex parte Johnny Haywood EMMONS.**

**No. 69218.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 23, 1983.

Johnny Haywood Emmons, pro se.

Robert Huttash, State's Atty., Austin, for the State.

OPINION

PER CURIAM.

This is an application for a writ of habeas corpus which was submitted to this Court by the trial court pursuant to the provisions of Art. 11.07, V.A.C.C.P. *Ex parte Young,* 418 S.W.2d 824 (Tex.Cr.App.1967).

Applicant was convicted of the offense of impersonating a peace officer; and the punishment was assessed at imprisonment in the Texas Department of Corrections for five years. No direct appeal was taken.

In his present application, Applicant contends that he was fraudulently induced by his counsel to waive his appeal, that his counsel was ineffective for telling him that the appeal would be frivolous, and that he was not advised by counsel and the trial court that he could proceed pro se on appeal.

This application, however, presents a more serious question. The record reflects that the application was sworn to before a notary public on February 23, 1983, as follows:

> "After being duly sworn according to law, I say and depose on my oath that all things sworn and subscribed to in the foregoing petition are true and correct."

Article 11.07, V.A.C.C.P., provides statutory authority for the resolution of contested factual issues material to the question of whether the applicant is illegally restrained under a final judgment of conviction in a felony case. This article further requires that an application contain sworn allegations of fact rather than mere conclusions. *Ex parte Young,* 418 S.W.2d 824 (Tex.Cr.App.1967). In *Ex parte Jackson,* 616 S.W.2d 625 (Tex.Cr.App.1981), this Court reiterated that an application for writ of habeas corpus pursuant to Article 11.07 must be properly verified. See e.g. *Ex parte Eiland,* 420 S.W.2d 955 (Tex.Cr. App.1967), and compare *Ex parte Brooks,* 637 S.W.2d 955 (Tex.Cr.App.1982) and *Ex parte Burns,* 635 S.W.2d 744 (Tex.Cr.App. 1982). An examination of the application filed in this case clearly discloses that it stated sworn allegations of fact which if

proven would entitle the applicant to affirmative relief.

After receipt of this application, the trial judge commendably ordered an evidentiary hearing which was conducted on June 29, 1983. At the hearing, the applicant was represented by court-appointed counsel. The first witness was the applicant. After extensive testimony, the following occurred between the applicant and the trial judge:

"THE COURT: Mr. Emmons, I've sat here and listened to your testimony that you have given, and I must confess that I'm somewhat amazed.

Did you read this Writ of Habeas Corpus that you swore to that was filed in this Court?

A: Yes, sir, I read it.

THE COURT: Well, everything that you swore to in this Application for Writ of Habeas Corpus that I granted you a hearing on, you testified here today just didn't happen.

Now, you say you had help on this Application for prit (sic) of Habeas Corpus. Are you talking about Johnny Meadows?

A: Yes, sir. I just explained, Judge, to him, you know, my situation, and he filed that for me.

THE COURT: Well, you signed it and you swore to it.

A: Yes, sir, I signed it. I remember signing it.

THE COURT: All right. Now, the first thing you say in this Application is that when I advised you about your right to appeal, after I had sentenced you to five years—

A: Yes, sir.

THE COURT: —I advised you of your right to appeal that you immediately gave notice of appeal in open Court. Now, you didn't do that, did you?

A: I didn't know that was in there.

THE COURT: Well, did you read it, where it says that and you swore to it?

A: I didn't understand that was in there.

THE COURT: And that is just a plain bald-faced lie, isn't it?

A: Yes, sir, that is. I didn't understand that being in there, Judge.

THE COURT: Now then, the next thing, he says in there is that after you said in open Court that you wanted to appeal, that Mr. Johnson told you that the only way he would appeal it would be if you would give him $2,000.00.

And that's just a bald-faced lie, isn't it? That didn't happen, did it?

A: He told me about the $2,000.00 upstairs.

THE COURT: Well, your testimony is today that he told you before you ever even pled guilty that if you had $2,000.00 it would help your case some way.

A: Yes, sir.

THE COURT: And that was the only mention that was ever made of $2,000.00?

A: The mention upstairs.

THE COURT: Now, in this Application that you swore to, you say that he told you that he would appeal it if you gave him $2,000.00.

That's just not right, is it?

A: I didn't know it was wrote up that way, Your Honor.

THE COURT: Now, is this Meadows some sort of a jail house lawyer?

A: Yes, sir.

THE COURT: What did you pay him to get him to do this for you?

A: Just some, you know, coffee and stuff along.

THE COURT: Do you realize that by signing this and swearing to this Application that you probably committed another criminal offense?

A: No, sir, I didn't realize it.

THE COURT: Did you ever tell this fellow Meadows that you gave notice of appeal in open Court?

A: No, sir, I did not.

THE COURT: Did you ever tell this fellow Meadows that Jim Johnson told you that he would appeal your case for $2,000.00?

A: No, sir, I just told him about the $2,000.00 upstairs.

THE COURT: Is this jail house lawyer of yours, Johnny Meadows, still down at Retrieve with you?

A: Yes, sir.

THE COURT: You give him a message from me; will you?

A: Yes, sir, I will.

THE COURT: You tell him that I have referred this matter to the District Attorney, and it's my recommendation to the District Attorney that he take this matter before the Grand Jury, both as it pertains to you for the lying that you have done in this instrument, and that of Mr. Meadows, based upon what you have testified to here today.

A: Yes, sir.

THE COURT: All right. You may step down. I don't have any other questions for you."

The record of the evidentiary hearing was transcribed and forwarded to this Court along with the trial court's finding of fact and conclusions of law. See *Ex parte Carnes,* 579 S.W.2d 249 (Tex.Cr.App.1979). The thorough trial judge also ordered the court reporter's notes from the applicant's plea of guilty transcribed and made a part of the record in this case. Thus, this Court has a well developed record upon which to review the trial court's findings. *Ex parte Ramirez,* 577 S.W.2d 261 (Tex.Cr.App.1979); *Ex parte Harris,* 593 S.W.2d 330 (Tex.Cr.

App.1979); *Ex parte Harris,* 593 S.W.2d 330 (Tex.Cr.App.1979); *Ex parte Bates,* 640 S.W.2d 894 (Tex.Cr.App.1982).

The trial judge in his findings makes the following specific observation:

"5. This Application presents a classic example of the abuse by some prison inmates of the judicial system. JOHNNY HAYWOOD EMMONS is in and he WANTS OUT! He wants out even if it's only for a little while, even if it only delays and doesn't prevent the incarceration. He wants out, even if it only means a trip to the jail for an evidentiary hearing. His jailhouse lawyer wants the tangible benefits and rewards he can extract from EMMONS for helping with the paperwork.[1] Between them, they concoct a piece of pure fiction they denominate a Writ of Habeas Corpus. As a result of their ploy, prison officials, district clerks, court coordinators, sheriff's officers, bailiffs, court reporters, former defense counsel and new defense counsel are charged with responsibilities, and must discharge them, not to mention the hours of judge time, and this just at the Trial Court level! The taxpayers of this State have been robbed of a lot of dollars by these two inmates, and this Court does not believe they ought to be allowed to do so with impugnity."

We agree with the trial court's observations.

1. The application originally filed in the trial court reflects that it was apparently prepared by "next of friend: Johnny J.E. Meadows." The records of this Court reflect that Johnny E. Meadows, T.D.C. No. 234332, was convicted of the offense of murder on the plea of guilty, after the State made known that it would not seek the death penalty. Punishment was assessed at imprisonment in the Texas Department of Corrections for life. Meadows' conviction was affirmed on direct appeal. *Meadows v. State,* 499 S.W.2d 156 (Tex.Cr.App.1973). This Court's writ file No. 4995 reflects that Meadows has himself filed a dozen or more post-conviction applications challenging his own confinement in one way or another. Meadows should be familiar with this Court's doctrine of abuse of the writ, having been cited for abuse himself with respect to his own con-

viction on October 18, 1977. As the evidence set out above from the evidentiary hearing clearly indicates, Meadows does not seem to be operating as a "jailhouse lawyer" solely for altruistic motives, but appears to receive some sort of compensation for his efforts in drafting post-conviction applications for other inmates. On the basis of the record presented in this case, it would appear that Meadows could conceivably be charged with being a party to the offense of aggravated perjury (see V.T.C.A. Penal Code Sec. 37.03 and Sec. 37.01) as well as the offense of barratry (V.T.C.A. Penal Code Sec. 38.12).

This Court can further take judicial notice of the fact that licensed attorneys are available to assist inmates of the Texas Department of Corrections through the Office of Staff Counsel for Inmates.

■ The record in this case clearly demonstrates that this applicant is abusing the process of this Court. The writ of habeas corpus is too serious and important a matter to be lightly and easily abused. See *Ex parte Carr*, 511 S.W.2d 523 (Tex.Cr.App. 1974); *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). See also *Smith v. Estelle*, 562 F.2d 1006 (5th Cir.1977); *McDonald v. Estelle*, 590 F.2d 153 (5th Cir.1979); *Potts v. Zant*, 638 F.2d 727 (5th Cir.1981); *Henson v. Estelle*, 641 F.2d 250 (5th Cir.1981) (delayed applications).

We hold that Applicant's contentions are not only without merit, but have been waived and abandoned by his abuse of the writ of habeas corpus.

■ Therefore, the Honorable Thomas Lowe, Clerk of the Court of Criminal Appeals is instructed not to accept in the future any applications for writ of habeas corpus attacking this conviction unless Applicant has first shown that any contentions presented have not been raised previously and a showing is made that they could not have been presented in any earlier application for habeas corpus relief.[2] *Ex parte Dora*, 548 S.W.2d 392 (Tex.Cr.App.1977); *Ex parte Bilton*, 602 S.W.2d 534 (Tex.Cr. App.1980); *Ex parte Stuart*, 653 S.W.2d 13 (Tex.Cr.App.1983).[3]

2. In *Ex parte Dora, supra,* this Court explained the duty of the trial court after the entry of an abuse order as follows:
   "Where a petitioner has been previously cited for an 'abuse of the Great Writ,' the trial court should not thereafter consider the merits of any application for writ of habeas corpus filed by that petitioner. The trial court should, however, review the application and make findings that this petitioner has abused the writ in the past, thus making the review procedure of this Court more efficient. The transcript should be forwarded to this Court, just as in all other cases, pursuant to our automatic review jurisdiction. See Art. 11.07, Sec. 2(a), *supra.* The writ transcript should, of course, be forwarded to this Court within fifteen days of the trial court's order. See Art. 11.07, Sec. 2(c), *supra.*"

3. In *Ex parte Bilton, supra,* the applicant had been cited for abuse of the writ on March 1,

TEAGUE, Judge, concurring and dissenting.

I believe that the majority orders the wrong person to be punished for what has happened in this cause. To "abuse" Johnny Haywood Emmons, applicant, will be doing a useless act. If anyone should be punished, it is Johnny J.E. Meadows, a person whom I do not know. The record, however, informs me that Meadows is the person who prepared the application for writ of habeas corpus that Emmons signed, swore to,* and filed in this cause. The record also reflects that Meadows, who is in the penitentiary, holds himself out to other inmates as being "a writ writer."

The record completely demonstrates that Meadows did not know what he was doing when he drafted the application for writ of habeas corpus on behalf of Emmons.

I pause to state that Meadows is not one of those persons I prefer to call "a true writ writer." The true writ writer is a person who is intelligent enough to recognize his own shortcomings. He assists his fellow inmates for no other reason than concern for their well being. The true writ writer has made valuable contributions to the criminal justice system of this State. Persons like Meadows, however, are not true writ writers. Now is the time for this Court to initiate necessary legal action

1978. This Court considered the merits of a subsequent application and granted relief, finding that the indictment was fundamentally defective based upon cases decided subsequent to the entry of the abuse of writ order. Likewise, in *Ex parte Stuart, supra,* the applicant received relief after the entry of an abuse of the writ order. There was likewise a major change in the law with respect to Stuart's conviction as a result of this Court's decision in *Ex parte Augusta,* 639 S.W.2d 481 (Tex.Cr.App.1982).

* The majority in footnote 1 of its opinion indicates that both Meadows and Emmons could be lawfully convicted of committing aggravated perjury. In light of the record and this Court's decision of *Childress v. State,* 398 S.W.2d 754 (Tex.Cr.App.1966), and *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), I seriously doubt whether any such conviction would stand on appeal.

which will result in Meadows' "law office" being shut down.

Contrary to the majority, I find many reasons why there are so many spurious allegations in the post-conviction application for writ of habeas corpus filed by Emmons, and why Emmons was not punctilious in the premises. Among those reasons are the following: Emmons is either totally or functionally illiterate, has slight educational attainments, and is limited in intelligence.

The record expressly reflects that at the time of conviction, Emmons was a 36 year old white male who had quit school after he had reached the 8th grade. He is a recidivist. He has been confined in Rusk State Hospital on either 2 or 3 prior occasions for treatment of alcoholism. He has demonstrated suicidal tendencies in the past, as well as having suffered visual and auditory hallucinations. His memory has been impaired for recent and remote events. He has scored 69 on the WAIS Verbal test; 65 on the Performance test; and has a full scale intelligence quotient of 65. Experts in the field of mental retardation inform us that a person who suffers with an intelligence quotient of 70 or less is deemed mentally retarded. See, for example, Macklin and Gaylin, *Mental Retardation and Sterilization, A Problem of Competency and Paternalism* (1981).

One obvious fact that I find the majority overlooks in its opinion is that there are inmates in the penitentiary who are superior in intelligence to other inmates. Unfortunately, some of those persons use their superior intelligence to take advantage of lesser endowed inmates. They act much like the leading character did in the book entitled *King Rat,* by James Clavell. A few of those persons erroneously refer to themselves as "writ writers." Unfortunately, those persons do not operate with the same spirit that the "true" writ writers do, preferring instead to operate solely in a selfish manner. They also give erroneous legal advice and information to other inmates. Such persons give "the true writ writer" a bad name. Meadows is not "a true writ writer." Instead, he is the person responsi-

ble for what the majority does to Emmons in this cause.

Since *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), prison inmates have had a constitutionally protected right to receive legal advice and services from inmate writ writers; at least where legal assistance from bona fide and professionally trained lawyers is not available. Although professionally trained lawyers are employed by The Department of Corrections to assist inmates with their legal problems, their number is so small that it is humanly impossible for them to take care of the legal needs of the entire prison population, which hovers at the present time at the 40,000 mark. Because there is an insufficient number of professionally trained lawyers to assist inmates with their legal needs, it is oftentimes necessary for inmates to rely on other inmates for legal advice and information. And to a point that is all well and good.

However, when members of the judiciary of this State are made aware of inmates being abused by unscrupulous and irresponsible "writ writers," such as Meadows, whose only claim to fame appears to be that to other inmates he is articulate in the field of criminal law and procedure, when he really isn't, then those members have a duty and responsibility to discipline the abusers, or, at a minimum, to initiate procedures that will result in the phony writ writer being put out of business. See *In the Matter of the Alleged Contumacious Conduct of Clovis Carl Green, Jr.,* 586 F.2d 1247 (8th Cir.1978), cert. denied, 440 U.S. 922, 99 S.Ct. 1249, 59 L.Ed.2d 475 (1978).

I believe that this Court should immediately invite the Attorney General of Texas to seek injunctive relief against Meadows to prevent Meadows from writing any more writs for other inmates for use in the courts of this State, and from practicing law while incarcerated in the Texas Department of Corrections. Not to initiate such action today against Meadows will allow a cancer in the Texas Department of Corrections to either fester or spread. Surgery is the only cure. I for one believe that the Attorney

General of Texas is competent to perform that surgery.

To the majority's action in denying Emmons any relief, I concur. To its action ordering that Emmons be abused in the premises, I dissent.