**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 99-10169

————————

RICHARD WAYNE JONES,

Petitioner-Appellant,

versus

GARY JOHNSON, Director, Texas Dept. of Criminal Justice, Institutional Division

Respondent-Appellee.

Appeal from the United States District Court
For the Northern District of Texas
District Court Number 4:95-CV-245-Y

April 7, 2000

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

Richard Wayne Jones appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We affirm.

**I**

Tammy Livingston was last seen alive at around 7:00 p.m. on February 19, 1986. Ruthie Amato saw Livingston abducted from a store parking lot by a man she later identified as Jones.[1] Amato testified at trial that as Livingston got into her car, Jones forced his way in, shoved Livingston

---

[*]    Pursuant to 5ᵀᴴ CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

[1]    Amato testified that she first saw Jones from a distance of "maybe five, six feet," that she clearly saw his face, and that there were no obstructions or lighting deficiencies limiting her view.

into the passenger seat, and drove away.

Livingston's body was discovered at 11:19 p.m. in a vacant field by firefighters responding to a report of a brush fire. She had been stripped naked, tied up in her own clothes, doused in gasoline, and set on fire. Authorities determined that she died from seventeen stab wounds to her neck and throat. A man living near the field testified that he heard a woman scream around 9:30 p.m.

The following day, Jones and Yelena Comalander, his girlfriend, used Livingston's credit cards to purchase clothes and other items. They also tried to use a check of hers to purchase groceries, which led to Comalander's, but not Jones's, arrest. Upon her arrest, she brought police to her house and showed them various property of Livingston's, including jewelry. Comalander also indicated that Jones had taken her to the field the night before where he had started a fire.

The same day, police found Livingston's abandoned station wagon. Jones's thumb print was on the driver's-side window.

The police arrested Jones and questioned him. He signed a written confession admitting that he killed Livingston. The police found blood on the pants he wore on February 19 which was consistent with Livingston's blood and inconsistent with his own blood. They also found that the blade of a knife Jones gave to his sister Brenda Jones Ashmore shortly before his arrest was consistent with Livingston's wounds.[2]

## II

Jones pled not guilty and was tried before a jury on the charge of capital murder in the course of committing or attempting to commit kidnaping or robbery. Jones testified on his own behalf. He claimed that he arrived home from work on February 19 and went with Ashmore to a friend's house. There, he claimed he met Walt Sellers, who had blood on his shirt and arms and who sold him Livingston's checks, credit cards, jewelry, and car. He claimed that Sellers took him to Livingston's station wagon and that he drove the car to another location. He admitted using Livingston's credit cards and checks but denied kidnaping or murdering Livingston or burning her body.

---

[2] The police discovered blood on the knife and on Jones's boots, but not in sufficient quantities to allow testing.

The jury found Jones guilty. At the sentencing phase of the trial, the jury answered the two special issues then set forth under Texas Code of Criminal Procedure article 37.071 in the affirmative. Accordingly, the trial court sentenced Jones to death.

The Texas Court of Criminal Appeals affirmed Jones's conviction. *See Jones v. State*, 843 S.W.2d 487, 490 (Tex. Crim. App. 1992). The Supreme Court denied his subsequent petition for writ of *certiorari*. *See Jones v. Texas*, 507 U.S. 1035, 113 S. Ct. 1858, 123 L. Ed. 2d 479 (1993).

Jones moved for state habeas corpus relief, offering a new explanation for his involvement in Livingston's murder. He denied killing Livingston but admitted burning her body, claiming that he did it to protect Ashmore, who was involved in the murder with Sellers. Finding his new story non-credible, the trial court recommended denying his petition. The Court of Criminal Appeals adopted this recommendation.

Jones filed a federal habeas petition, which he dismissed shortly thereafter to exhaust certain claims in state court. He then filed a second state habeas petition, but the state trial court again recommended denying his petition and the Court of Criminal Appeals again adopted the trial court's recommendation.

Jones then filed the instant petition for federal habeas corpus. The matter was referred to a magistrate judge, who recommended denying Jones's request for an evidentiary hearing and denying his habeas petition. After Jones filed objections to the magistrate judge's order, the district court adopted the magistrate's recommendations and denied Jones's petition.[3] Jones moved to amend the judgment, but the district court denied this motion. The district court later granted his request for a certificate of probable cause, 28 U.S.C. § 2253 (1996),[4] allowing him to file this appeal.

---

[3] The district court adopted the magistrate's conclusion "for the reasons stated by the magistrate judge." Thus, we refer to the magistrate judge's reasoning and conclusions as the reasoning and conclusions of the district court.

[4] The habeas corpus statutes, including § 2253, were amended by the Antiterrorism and Effective Death Penalty ("AEDPA") on April 24, 1996. AEDPA replaced the requirement that habeas appellants obtain a certificate of probable cause with a requirement that they obtain a certificate of appealability. *See* 28 U.S.C. § 2253. Because Jones filed his petition before AEDPA's effective date, however, he is not subject to the AEDPA amendments; instead, his petition is governed by the former versions of §§ 2253 and 2254. *See Tucker v. Johnson*, 115 F.3d 276, 279 n.3 (5th Cir. 1997).

## III

Jones advances several arguments on appeal: (1) the district court improperly refused to consider his actual innocence claim as a distinct claim; (2) his confession should have been suppressed because it was involuntary; (3) his trial counsel was ineffective for not properly exploring the scope of Scott Christian's Fifth Amendment privilege against testifying; (4) he was unable to introduce James King's and Douglas Daffern's grand jury testimony (a) in violation of his due process rights and (b) in violation of his right to effective assistance of counsel; and (5) he was unable to introduce Comalander's grand jury testimony (a) in violation of his due process rights, and (b) in violation of his right to effective assistance of counsel.[5] We review Jones's challenges to the lower court's legal rulings *de novo* and his challenges to its factual findings for clear error. *See Blackmon v. Johnson*, 145 F.3d 205, 208 (5th Cir. 1998). We defer to the state court's factual findings. *See* 28 U.S.C. § 2254 (1996).

## A

Jones argues that he has produced new evidence showing that he is actually innocent and that it would violate his Eighth and Fourteenth Amendment rights to execute him when he is actually innocent. Jones derives this claim from *dicta* in *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). In *Herrera*, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying criminal proceeding." *Id.* at 400, 113 S. Ct. at 860, 122 L. Ed. 2d at __. Nevertheless, the Court "assume[d], for the sake of argument . . . , that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant habeas relief if there were no state avenue open to process such a claim." *Id.* at 417, 113 S. Ct. at 869, 122 L. Ed. 2d at __ (finding that the petitioner's showing of actual innocence fell short of the "high threshold" showing

---

[5] Jones advanced several arguments below which we do not consider because he does not renew them on appeal. *See Carson v. Collins*, 993 F.2d 461, 464 n.3 (5th Cir. 1993).

of actual innocence he would have to make).

We have since interpreted *Herrera* as not changing the established rule "that a claim of actual innocence based on newly discovered evidence fails to state a claim in federal habeas corpus." *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998). Jones concedes this but cites cases from other circuits which, he argues, have read *Herrera* as allowing claims of actual innocence as an independent ground for relief. *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (stating that "a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution," and citing the concurrences of Justices O'Connor and Kennedy and the dissents of Justices Blackmun, Stevens, and Souter for the proposition that "[a] different majority of the Justices would have explicitly so held"); *Griffin v. Delo*, 33 F.3d 895, 908 (8th Cir. 1994) (suggesting that a claim of actual innocence might be possible, but rejecting the petitioner's showing); *cf. Milone v. Camp*, 22 F.3d 693, 699-700 (7th Cir. 1994) (noting that "[t]he Supreme Court appears to be willing to hold that it is unconstitutional to execute a 'legally and factually innocent person,'" but stating that this does not apply where a prisoner is not sentenced to death). These cases do not affect *Lucas's* status as binding authority in this circuit which we must follow absent its reversal by statute, the Supreme Court, or an *en banc* panel of this court.[6] *See Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998). Accordingly, Jones's claim of actual innocence is not cognizable on federal habeas corpus absent an independent constitutional violation. *See Lucas*, 132 F.3d at 1075.

**B**

Jones moved to suppress his confession at trial, arguing that Detective Larry Steffler coerced him by telling him that if he did not confess, Comalander would be sent to death row and Jones would never see his child, which she was carrying. The district court denied his motion. He did not directly

---

[6]    Even if we could entertain Jones's free-standing claim of actual innocence, Jones's new evidence would not meet the "extraordinarily high" showing necessary to obtain the relief he seeks. *Cf. Lucas* 132 F.3d at 1075 n.3 (noting that even if we had considered Lucas's actual innocence claim, it would have failed); *Carriger*, 132 F.3d at 476 (noting that a petitioner would not be entitled to relief unless he at least "affirmatively prove[d] that he is probably innocent"). This showing would be at least as high as the showing of actual innocence Jones needs to make to excuse some of his procedural defaults; because, as noted herein, he does not meet that standard, he cannot meet the higher standard which would govern a free-standing actual innocence claim.

appeal the denial but instead raised the involuntariness of his confession in his state habeas proceedings. The court—in both of Jones's state habeas petitions—found that his involuntary confession claim was procedurally barred because he did not raise it on direct appeal.

Generally, a state court's finding that a claim is procedurally barred prevents a litigant from obtaining federal habeas relief on that claim absent a showing of cause for the default and prejudice attributable to it. *See Miller v. Johnson*, 200 F.3d 274, 291 (5th Cir. 2000). Jones, however, challenges the state court's reading of state procedural law. Although, "[w]e presume the adequacy and independence of [the] state procedural rule," Jones can rebut this presumption by showing that "the state's procedural rule is not 'strictly or regularly followed.'" *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575, __ (1988)).

The state court based its procedural bar finding on *Ex Parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989) (on rehearing), a case which Jones argues would have allowed him to raise his involuntary confession claim for the first time via a state habeas petition.[7] In *Banks*, the Court of Criminal Appeals found that a litigant could not raise a statutory claim regarding juror exclusion via a habeas petition when she had foregone that claim on direct appeal. The court stated: "Traditionally, habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. The Great Writ should not be used to litigate matters which should have been raised on appeal." *Id.* at 540.

*Banks* distinguished *Ex parte Bravo*, 702 S.W.2d 189 (Tex. Crim. App. 1982) (en banc),

---

[7] In addition to *Banks*, the court also cited *Ex parte Emmons*, 660 S.W.2d 106 (Tex. Crim. App. 1983), and *Ex parte Selby*, 442 S.W.2d 706 (Tex. Crim. App. 1969). In *Emmons*, the court noted that the petitioner had foregone a direct appeal and only filed a habeas petition. *See Emmons*, 769 S.W.2d at 107. The court never identified this as significant to its decision to deny the habeas petition, however, but instead appeared to deny the petition on the basis of the petitioner's admitted lies in the verified petition. *See id.* at 109-10; *see also* Jeffrey B. Keck, Criminal Procedure: Trial and Appeal, 39 Sw. L. J. 495, 527 & nn.312-13 (1985) ("In *Ex parte Emmons*, a per curiam opinion, the court confronted the problem of inmates who file pro se writs of habeas corpus that contain fabricated facts, which, if true, would entitle the applicant to relief, and the problem of 'jail house lawyers' who help prepare such pro se writs."). Similarly, in *Selby*, the petitioner did not appeal but instead proceeded by state habeas petition. *See Selby*, 442 S.W.2d at 707. The court found that Selby waived one issue by not appealing it (apparently an evidentiary issue), but seemingly considered a constitutional claims on the merits. *See id.* at 707-09.

where a defendant was allowed to challenge the exclusion of a juror on constitutional grounds even though he did not raise the challenge on direct appeal. The court excused his failure to make the argument on direct appeal in passing, noting that "error rising to the level of constitutional error may be raised for the first time in a post-conviction application for writ of habeas corpus even though not raised in the direct appeal." *Id.* at 190. Subsequently, in denying the state's motion for rehearing, the court noted that Bravo could not have raised his full constitutional claim on direct appeal because it was based in part on a subsequently-decided Supreme Court decision. *See id.* at 193 (on denial of rehearing). This apparent qualification does not appear significant. The court did not withdraw its earlier opinion and *Banks* subsequently distinguished *Bravo* only on the grounds that "[b]ecause [the *Bravo*] error was of constitutional magnitude, we considered it on application for writ of habeas corpus even though the error was not raised on direct appeal. . . . In the case before us, . . . no constitutional issues are raised." *Banks*, 769 S.W.2d at 541.

In *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998) (on rehearing), the Court of Criminal Appeals recently held that a petitioner was procedurally barred from raising a constitutional claim via a state habeas petition when he did not raise it on direct appeal. *See id.* at 199. One judge disagreed with this reading of the case law, arguing that it was "very well-settled that it is appropriate to raise . . . [a] claim of constitutional magnitude via habeas corpus application even if it was not raised on direct appeal." *Id.* at 201 (Overstreet, J., dissenting) (citing *Bravo*). The dissenting judge was relying on the law in place at the time the state court ruled on Jones's habeas petitions.

In sum, the Texas cases provide some support for Jones's argument that the procedural bar applied by the state court here was not adequate because it was "not strictly or regularly followed." *Sones*, 61 F.3d at 416. We need not resolve this question, however, because Jones's involuntary confession claim fails on the merits.

Jones argued that Officer Sheffler coerced his confession by telling him that Sheffler would "make sure that Yelena [Comalander] went to the penitentiary and had [Jones's] baby in the

penitentiary" and that the state would then give the baby away. Jones also said Sheffler promised him that if he confessed, Sheffler would "make sure that the capital murder charges was not filed on her."

Sheffler initially admitted threatening Jones. However, on the second day of his testimony, he denied threatening or making promises to Jones. He explained his testimony from the previous day by stating that he had been "inattentive" and had mistakenly agreed that he had threatened Jones.

The state court found, in a written order, that Jones's statement was voluntary. In doing so, it made no finding that Jones's testimony about Sheffler's threats and promises were true, but instead it implicitly accepted Sheffler's (and rejected Jones's) description of the interrogation and his explanation for his contradictory testimony. *See Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993).[8] We must respect the state court's factual determination unless it is "not supported by the record." 28 U.S.C. § 2254(d)(8) (1996). Because the state court found no coercion, and because this is supported by Sheffler's testimony in the record, we cannot accept Jones's allegations of threats and promises. *See Pemberton*, 991 F.2d at 1225 ("Whether the police engaged in the coercive tactics alleged by the defendant is a subsidiary fact; as such, the trial court's finding is entitled to deference on habeas review if it is supported in the record. The testimony of the state's witnesses provides support for the state trial court's finding that no abuse occurred. This court cannot credit Pemberton's allegations.").

Deferring as we must to the state court's determination that Sheffler's second account of the interrogation was truthful and that Jones's was not, we must find that Jones's confession was voluntary. He has introduced no evidence showing that he was otherwise improperly coerced, and

---

8      In *Pemberton*, we stated:
       The trial judge was essentially presented a swearing match between Pemberton and the officers as to whether any coercion occurred and as to the identity of the officers present at the various interviews. The habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact. The trial judge must have believed the version of the story told by the state's witnesses, as evidenced by his finding that the confession was voluntary. The trial judge, in a written order, made
       no finding supporting Pemberton's account of the interrogation.
*Id.*

the testimony shows that his confession was otherwise voluntary. *See United States v. Mullin*, 178 F.3d 334, 341 (5th Cir.) ("A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching, either by direct coercion or subtle psychological persuasion."), *cert denied,* — U.S. —, 120 S. Ct. 454, 145 L. Ed. 2d 370 (1999).

## C

Jones's attempt to call Scott Christian as a witness at trial was unsuccessful because Christian invoked his Fifth Amendment privilege against testifying. Jones argues that his trial counsel was ineffective for not properly exploring the scope of Christian's privilege. We evaluate ineffective assistance of counsel claims under the familiar two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, Jones must show that his counsel's performance was deficient. *See Dupuy v. Cain*, — F.3d —, 2000 WL 52124, at *7 (5th Cir. Jan. 24, 2000). This requires overcoming the strong presumption that counsel's conduct fell within the range of reasonable assistance. *See id.* Second, Jones must show that the deficiency prejudiced him. *See id.* This requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, and that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable." *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999). Where, as here, the state court has made a determination that counsel was effective, we do not grant a presumption of correctness to the state court's overall finding, which presents a mixed question of law and fact, but we do grant the presumption of correctness to all subsidiary findings of fact. *See* 28 U.S.C. § 2254 (1996); *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

Christian went to the police and swore out an affidavit stating the following. Sellers offered to sell Christian and another person some stolen checks and a credit card. Sellers had blood spatters on his shirt. Jones arrived with Ashmore to buy drugs, and when Christian declined the offer to buy

the card and checks from Sellers, Jones purchased then. Although he was uncertain of the date on which these events occurred, Christian stated that Ashmore was arrested for using the checks a day or two after she purchased them.

Based on this affidavit, Jones's counsel, Jack Strickland, attempted to call Christian as a witness. Christian invoked his Fifth Amendment privilege against self-incrimination and declined to testify. Jones argues that, rather than accepting Christian's blanket invocation of his Fifth Amendment privilege, Strickland should have explored the full scope of Christian's privilege and attempted to elicit some non-privileged testimony from him.

A witness's Fifth Amendment privilege only exists when the witness has "reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 818, 95 L. Ed. 1118 (1951). In light of this, a court cannot accept a witness's blanket assertion of the privilege but rather should make "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976), *quoted in United States v. Goodwin*, 625 F.2d 693, 701 (5th Cir. 1980) ("The witness may be totally excused only if the court finds that he could legitimately refuse to answer essentially all relevant questions.") (quotations omitted).

Strickland objected to Christian's invocation of his privilege. The court offered to hold an *in camera* hearing to determine the scope of Christian's privilege, but Strickland did not follow up on this offer. Strickland and his trial co-counsel, Bill Lane, explained their decision not to follow up on the *in camera* offer in affidavits they submitted to the state court for the second habeas hearing. Both claimed that they changed their trial strategy regarding Christian's testimony after Christian's attorney indicated that Christian risked perjuring himself if he testified.[9] In his affidavit submitted for

---

[9] Christian's attorney stated that the prior affidavit "was a sworn statement and any testimony that he might offer today which was in conflict with that statement would subject him to the laws of perjury in this State. I'm, of course, not saying there would be a conflict but that, of course, is a concern."

the second state habeas hearing, Christian states that he was concerned about being asked questions about his own drug activity, apparently stating that he was not concerned with being charged with perjury.[10] They claimed that they became concerned that Christian might either change his story at trial or testify untruthfully, a risk they decided outweighed the value of his testimony. Their affidavits are supported by the record: when Christian's counsel indicated that Christian might perjure himself, Strickland stopped pursuing Christian as a witness (apart from asking that Christian be given immunity or that the state be limited in its impeachment of him) and instead focused on stipulating to facts surrounding his affidavit.

Under these circumstances, Strickland's decision not to inquire into the scope of Christian's Fifth Amendment privilege was a reasonable trial strategy. *See generally Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) ("[A]n attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, are virtually unchallengeable.") (quotations omitted). Strickland reasonably suspected that Christian might change his story or testify untruthfully, and he knew that Christian's testimony was of limited use because it did not rebut all of the evidence against Jones and it appeared unreliable. The testimony did not challenge Amato's identification of Jones as the man who abducted Livingston or offer an explanation for the physical evidence connecting Jones to the murder (with the exception of the credit card and checks). Additionally, Christian's affidavit indicated that he decided to testify after meeting and speaking Jones in jail, it mistakenly identified Ashmore as the one who was arrested for using the checks rather than Comalander, and it did not identify who the checks and credit card belonged to.[11]

For the same reasons, even if we were to find that Strickland was deficient for not inquiring as to the scope of Christian's Fifth Amendment privilege, Jones does not show that the deficiency prejudiced him. Because the affidavit does not clearly exculpate Jones, and because it suffers credibility problems, Jones has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chavez*, 193 F.3d at 378.

**D**

Jones raises alternative challenges to the district court's exclusion of grand jury testimony from James King

---

In his affidavit submitted for the second state habeas hearing, Christian states that he was concerned about being asked questions about his drug activities, apparently stating that he was not concerned with being charged with perjury. Jones suggests that given this, Strickland would have realized he could use Christian's testimony had Christian been questioned *in camera*. This is irrelevant because Strickland did not know at the time that Christian was not testifying to avoid talking about his drug activities (indeed, Christian's counsel's statements reasonably led Strickland to believe Christian was avoiding testifying for other reasons), nor could he have known.

[11] Christian submitted another affidavit in the second state habeas case. The affidavit states that the woman whose credit card Sellers sold was "a blond woman in her twenties," but it does not otherwise elaborate on his pretrial affidavit.

and Douglas Daffern. Jones attempted to introduce this testimony after his investigator was unable to locate either of them. He argues now (1) that the district court improperly excluded the grand jury testimony, or, alternatively, (2) that Strickland was ineffective for not offering King's testimony properly.

**1**

Jones first challenges the district court's exclusion of King's and Daffern's grand jury testimony. To make this challenge, he must first overcome the state court's finding (in the second habeas action) that Jones was procedurally barred from raising this claim because he did not properly object to the exclusion at trial. Jones argues that the state court's procedural bar finding is unsupported by the record, and this argument has some merit.[12] We need not resolve this question, however, because even if we found no bar, Jones has not stated a cognizable habeas claim regarding the exclusion of King's and Daffern's testimony.

"A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999). Jones argues that the exclusion of King's and Daffern's grand jury testimony violated his due process rights.

King testified before the grand jury that he saw Sellers one night with small amounts of blood on his shirt and that Sellers attempted to sell King checks and a car from Livingston. However, King was not certain whether Sellers or Jones told him that the property belonged to Livingston, and he admitted that Jones might even have told him this

---

[12] Strickland attempted to introduce Comalander's grand jury testimony after she invoked the Fifth Amendment and refused to testify. He successfully introduced her testimony "for the record only," prompting the state to move *in limine* to exclude the evidence from the jury. The court granted the state's motion and Strickland objected, indicating that Comalander's testimony should go to the jury because it was admissible as a hearsay exception and because it would violate Jones's due process and equal protection rights to exclude it. Strickland concluded, unsuccessfully, by "ask[ing] that the deposition or the testimony of Miss Comalander be allowed to be read to this jury." Shortly thereafter, Strickland moved to introduce King's and Daffern's grand jury testimony "for purposes of the record." The following colloquy ensued:

> MS. WILSON [for the State]: Your Honor, at this time we would also similarly, as we filed an oral motion in limine on the use before the jury of any testimony of Yelena Comalander, similarly file a motion in limine in regards to the testimony of James King or Doug Daffern.

> MR. STRICKLAND [for Jones]: Of course, we do object to that, Your Honor, for all the reasons we previously articulated. They apply equally well to Miss Comalander. We've demonstrated the unavailability both of Mr. Daffern and Mr. King—

> THE COURT: I'll allow your objections on the one for Ms. Comalander to carry forth for the other two and my ruling will be the same, being overruled.

Jones challenged the exclusion of King's and Daffern's grand jury testimony in his second state habeas petition, but the court found that the claim was procedurally barred because Jones had not objected at trial to exclusion of the evidence from the jury. Strickland, in the affidavit he submitted during Jones's second state habeas petition, agreed, asserting that the claim was not pursued on direct appeal because he had waived it by not properly offering the evidence at trial. The above colloquy does not seem to support the trial court's finding or Strickland's assertion about it.

-12-

in jail. More importantly, he testified that he saw these checks between January 1 and January 5, dates he testified he remembered because he was shot before January 1 and put in jail on January 5. These dates were a month-and-a-half before Livingston was abducted.

Daffern testified before the grand jury that Sellers had "credit cards, checks, keys to a car and what all—ID of two women." He indicated that Livingston was one of the women and he dated the meeting to late February or early March.[13] He testified that Sellers did not have blood on his clothes but that Sellers told him he had shot two people in a bar. Most importantly, he testified that he saw Sellers at about eight or nine in the morning.

Neither of these witnesses' grand jury testimony was excluded in violation of Jones's due process rights, as a brief review of the principal case Jones relies on shows. In *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), a Mississippi court prevented Chambers—who was charged with murder—from cross-examining another suspect about whether the suspect had committed the murder or from asking three other witnesses about whether the suspect had confessed to the murder. Noting that the three witnesses' hearsay statements bore sufficient indicia of reliability, the Court reversed the conviction because limiting Chambers's presentation of evidence violated his due process rights.[14] *See id.* at 300-01, 93 S. Ct. at 1048-49, 35 L. Ed. 2d at __ (noting several indicia of reliability in the witnesses' statements: each was made spontaneously to a close acquaintance shortly after the murder, each was corroborated by some other evidence, each was against the declarant's interest, and the other suspect could be cross-examined in court); *cf. Montana v. Egelhoff*, 518 U.S. 37, 53, 116 S. Ct. 2013, 2022, 135 L. Ed. 2d 361, __ (1996) ("[T]he holding of Chambers—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.").

King's and Daffern's grand jury testimony was not as directly exculpatory as the evidence in *Chambers*. Jones correctly notes that without this testimony, he had only his testimony to rely on to make out his claims that he was not involved with Livingston's death and that Sellers killed her. However, King's and Daffern's grand jury testimony would not have significantly altered the case Jones presented. King and Daffern only indirectly supported Jones's alibi

---

[13]    He agreed with the prosecutor's question before the grand jury that he previously told the prosecutor that "it was probably the last of February or the first of March."

[14]    Similarly, in *Green v. Georgia*, 442 U.S. 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979), the Court reversed a death sentence when the petitioner was not allowed to introduce testimony at the sentencing phase from a witness who testified that someone else confessed to killing the murder victim. *See id.* at 96-97, 99 S. Ct. at 2151-52, 60 L. Ed. 2d at __; *cf. Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir.) ("We think that *Green* is limited to its facts, and certainly did not federalize the law of evidence. It does, however, indicate that certain egregious evidentiary errors may be redressed by the due process clause."), *aff'd*, *Barefoot v. Estelle*, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090, (1983).

by offering testimony which was not necessarily inconsistent with Jones's guilt: both stated that Sellers had Livingston's property, and King (but not Daffern) testified that Sellers had some blood on his clothes. Neither testified that Sellers committed the murder or testified about Jones's activities that night in a way which supported his explanation of his own activities. Significantly, neither's testimony addressed any of the key evidence against Jones: how he obtained Livingston's possessions, his confession, Amato's identification of him, the blood on his pants, the knife that conformed to Livingston's wounds, and his fingerprint in the car.

Additionally, their grand jury testimony, while given under oath, was not wholly reliable. Neither testified against interest nor was their testimony wholly corroborated. *Cf. United States v. Hall*, 165 F.3d 1095, 1114 (7th Cir. 1999) ("[T]here was insufficient evidence corroborating these statements. In addition, Goble's and O'Toole's statements were neither sworn nor used against either declarant in a criminal proceeding."). Moreover, their testimony suffered credibility problems. King stated with certainty that Sellers had Livingston's property in January, over one-and-a-half months before the murder, and he admitted that he might have thought the credit cards were Livingston's because Jones suggested this to him in jail. While slightly more credible, Daffern testified that Sellers did not have blood on him, when he should have noticed this according to Jones's version of the murder. Additionally, Daffern testified that Sellers attempted to sell him the card and checks in the morning. This conflicts with Jones's own testimony, in which he stated that he purchased the cards and checks the night before. Under these circumstances, the exclusion of the testimony did not violate Jones's right to a fair trial.

**2**

Strickland's alternative argument, that Strickland was ineffective for not proffering King's grand jury testimony properly at trial, also fails.[15] As noted above, King's testimony only partially supported Jones's defense theory and it suffered reliability problems. Notable among these problems was King's misdating his encounter with Sellers by one-and-a half months and his admission that Jones might have told him in jail that Sellers had Livingston's checks and card. Given this unreliability and the fact that King's testimony did not fully exculpate Jones, Jones cannot show that he was prejudiced by counsel's failure to admit the testimony properly.[16]

**D**

Jones also challenges the exclusion of Comalander's grand jury testimony. As noted above, Jones moved to

---

[15] For purposes of this argument, we assume without deciding that Jones is procedurally barred from challenging the exclusion of King's grand jury testimony because Strickland never properly introduced it.

[16] Jones argued below that his counsel was ineffective for not challenging the exclusion of King's testimony on appeal. Assuming he preserved such a claim before us, it would fail. Counsel is not required to raise every non-frivolous claim on appeal, and we have rejected similar claims of ineffective assistance where, as here, counsel reasonably focused on the strongest appellate arguments. *See Ellis v. Lynaugh*, 873 F.2d 830, 839 (5th Cir. 1989).

-14-

introduce the transcript of her testimony after Comalander invoked her Fifth Amendment privilege at trial to avoid testifying.

Comalander testified to the following before the grand jury. Jones came home from work on the night of the murder and immediately left in his mother's car. He returned later, with his sister, in Livingston's station wagon. He did not have blood on him. Jones gave Comalander Livingston's credit cards and checks from a purse in the car. He told her he obtained the car and the purse from "Walt." They drove to a parking lot where Jones's mother's car was parked, and Comalander drove his mother's car to another parking lot where Jones left the station wagon. They then drove around together, tried to use Livingston's bank card, looked for Ashmore, went home to pick up gasoline, and then went to the field where Comalander saw Jones light part of the field on fire. Comalander admitted that she gave an earlier statement to the police in which she did not mention Walt's involvement. She also admitted that she had lied in her statement to the police.

Jones argued on appeal that the trial court's exclusion of this testimony was improper. Although the Court of Criminal Appeals found that the grand jury testimony was generally admissible under a hearsay exception, it found that most of it was hearsay statements Jones made to Comalander which were not independently admissible. The court noted that some of Comalander's testimony was not hearsay, *see Jones*, 843 S.W.2d at 492 ("The only portion of the testimony which is not hearsay is Comalander's testimony that when appellant came home on the night that the deceased was killed he did not have blood on his shirt or pants."), and therefore would have been admissible were it not for the fact that Strickland did not attempt to offer these portions of her testimony separately as required by state law. The court held that Strickland's failure to do this was a procedural bar that prevented Jones from challenging on appeal the exclusion of that part of the testimony. *See id.*

Jones now argues that (1) the district court violated his due process rights by not allowing the testimony, and (2) his counsel was ineffective for not preserving his entire objection to the exclusion.

**1**

Jones again relies on *Chambers* to argue that the exclusion of Comalander's grand jury testimony violated his due process rights. This claim fails as to Comalander's entire testimony because her testimony was not sufficiently reliable. As the Court of Criminal Appeals noted, most of her testimony was hearsay consisting of Jones's potentially self-serving statements to her. Additionally, she admitted during her grand jury testimony that she had lied during her first statement to police. When she was called as a witness at trial, she invoked her Fifth Amendment rights, with her attorney suggesting that she was invoking them in part because of the pending indictment against her for committing aggravated perjury in her grand jury testimony.

Nor was the evidence, as a whole, critical. Like King's and Daffern's testimony, it did not rebut crucial parts

-15-

of the evidence against Jones, and it actually would have conflicted with Jones's testimony at trial that he had no involvement in burning Livingston's body.

Jones could alternatively challenge the specific exclusion of the testimony about Jones not having blood on him, which the Court of Criminal Appeals found was the only non-hearsay portion of her testimony. His attempt to challenge the exclusion of this testimony, however, runs into the state court's finding that Jones was procedurally barred from making this challenge.

Generally, we allow a claim to proceed in spite of procedural default in one of two circumstances: (1) when the petitioner shows cause and prejudice for the default; or (2) when the petitioner shows that failure to review the claim would effect a miscarriage of justice. *See Fairman v. Anderson*, 188 F.3d 635, 641 (5th Cir. 1999). One means of showing a miscarriage of justice, which Jones attempts to do here, is by making a factual showing of actual innocence. *See Lucas*, 132 F.3d at 1077. "To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Fairman*, 188 F.3d at 644 (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808, __ (1995)). The petitioner can also rely on "evidence tenably claimed to have been wrongly excluded." *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864, 130 L. Ed. 2d at __, *quoted in Lucas*, 132 F.3d at 1077.

Jones was convicted after the jury heard the following evidence of his guilt: he confessed to the murder, his fingerprint was found inside the car, Amato identified him in court and in a lineup, blood consistent with Livingston's was on his clothes, the knife Ashmore surrendered (which she said was Jones's) matched Livingston's wounds, and Jones had Livingston's property. Additionally, Jones was the only one who testified that Sellers was the murderer, and he presented no witnesses who supported his alibi of being with family members at the time of the killing.

Jones offers two "new" pieces of evidence. First, in his state habeas petition, he submitted an affidavit from himself. In the affidavit, he contradicted his trial testimony by admitting some involvement with Livingston's death. He claimed that he was approached the night of the murder by Ashmore, who told him about Livingston's murder by Sellers and Ashmore, and who took Jones to meet Sellers. There, Sellers showed Jones the station wagon and had Jones get inside to test out the engine. Sellers sold Jones Livingston's checks, credit cards, and jewelry. Jones admitted burning Livingston's body but claimed that he did so to help Ashmore and Sellers and because they promised him the station wagon if he did so.

Jones's second piece of new evidence is a declaration from Terry Gravelle, which Jones submitted for the first time in his motion to amend the district court's denial of his habeas petition. Jones alleged that he only was able to locate Gravelle two days before the district court denied his habeas petition. Gravelle states that: Sellers told him in

jail that someone other than Jones murdered Livingston; Sellers told him Jones was given Livingston's property; and Ashmore implied to him that Sellers murdered Livingston.

Neither of these pieces of evidence meets Jones's burden of showing his actual innocence. The evidence is neither reliable[17] nor sufficiently exculpatory to carry Jones's actual innocence showing. *Cf. Fairman*, 188 F.3d at 644 ("Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence."). Even assuming Jones's affidavit qualifies as new evidence,[18] it is self-serving and flatly contradicts his testimony at trial. The Gravelle affidavit also is not convincing. It never expressly identifies Sellers as the murderer and is arguably hearsay. Additionally, it is inconsistent with Sellers's and Ashmore's testimony at Jones's evidentiary hearing in his first state habeas petition. Most importantly, while the two affidavits purport to explain some of the evidence against Jones (his fingerprint in the station wagon, the blood on his pants, and the knife), they do not explain two key pieces of evidence against him: Amato's identification of him as the abductor and his confession.[19]

Even the excluded grand jury testimony does not establish Jones's actual innocence. Collectively, the evidence does not make it "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Fairman*, 188 F.3d at 644 (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808, __ (1995)).

**2**

Jones also argues that Strickland was ineffective for not specifically offering those parts of Comalander's testimony which were not hearsay. As noted, the Court of Criminal Appeals found that the only helpful portion of her

---

[17]   The state court found, in the first state habeas action, that Jones's affidavit was "wholly incredible, in light of its timing, as well as its contents." It heard testimony from Ashmore and reviewed an affidavit from Sellers which both contradicted Jones's affidavit. It found both Ashmore's and Sellers's statements "credible," and we must defer to these factual findings. *See* 28 U.S.C. § 2254 (1996); *cf. Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("Unless Carter rebuts them by clear and convincing evidence, therefore, we are required to accept, as conclusive, both the factual findings and the credibility choices of the state courts.").

[18]   Jones's affidavit was not "new" in the sense that the information contained therein was available to him throughout trial. *Cf. Lucas*, 132 F.3d at 1075 n.3 (noting that "new" evidence must be evidence which, *inter alia*, the defendant could not have discovered through due diligence).

[19]   Jones argues now that we should disregard Amato's identification because "[t]he statement given to police by [her] did not match Mr. Jones in terms of hair color, or facial hair." The jury was presented with this attack on Amato's testimony and could reasonably have rejected it given her identification of him in court and her testimony about having picked him out in a lineup.
      Jones also argues that the confession only resulted after police led Jones on a "tour" of the different places involved in the crime and that it "internally belies its trustworthiness" because it only contains facts known to the police at the time Jones made the confession. Neither of these arguments undercuts the credibility of the confession.
      Jones's explanation that he signed the confession to avoid implicating Ashmore is unpersuasive, given that he states in his affidavit that he believed Sellers was the main perpetrator and that he attempted to implicate Sellers from the start. Additionally, it does not explain why he testified throughout trial that Sellers was the offender and that he had no involvement, only to offer a new explanation of his involvement on habeas.

testimony which Strickland could have offered, but did not, was her assertion that Jones did not have blood on him. Her other non-hearsay testimony was that: Jones returned home from work and immediately left in his mother's car, which he did not usually do; he later returned in the station wagon; and he took her out, used Livingston's bank card, and went to the field where he burned something.

The decision to not separately offer this testimony was not clearly deficient. With Comalander's hearsay statements removed, the only value of her testimony was her statement that he did not return with blood on him. Strickland could reasonably have decided that the value of this testimony was outweighed by her admission that she perjured herself in her initial statement to the police and by her testimony about Jones driving Livingston's station wagon and burning the field, which contradicted his trial testimony. Second, any deficiency of Strickland's was not prejudicial in light of the extremely limited value of Comalander's non-hearsay testimony.

**IV**

Finding that none of the claims Jones raises on appeal have merit, we AFFIRM the district court's denial of his petition for writ of habeas corpus.